Squire Earl HARVEY, Plaintiff,

v.

UNITED STATES of America, Defendant.

Mary MORGAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Richard H. LARKIN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 61-471, 62-4 and 62-5.

United States District Court
D. Oregon.
Dec. 31, 1962.

Robert Carney, Maguire, Shields, Morrison, Bailey & Kester, Portland, Or., for plaintiffs.

Joyle C. Dahl, Dept. of Justice, Washington, D. C., Donal D. Sullivan, Asst. U. S. Atty., Portland, Or., for defendant.

EAST, District Judge.

The plaintiffs in these actions seek refunds of various amounts of excise tax assessed by the District Director of Internal Revenue for Oregon (Director) and paid by the plaintiffs, respectively.

The plaintiffs had an interest in the operation of certain mechanical coin-operated amusement or gaming devices which were activated by the insertion of a coin and which for our purposes will be referred to as the "Skill Parade" machine, the "Jokers Wild" machine, and the "Rainbow Stamp" machine.

Section 4461 of the Internal Revenue Code of 1954 imposes a special tax upon devices "defined in paragraph (2) of section 4462(a)." The Director assessed the special taxes sought to be refunded by the plaintiffs under the premise that each of the three mentioned machines is: (§ 4462).

"(2) any machine which is—

"(A) a so-called 'slot' machine which operates by means of the insertion of a coin, token, or similar object and which, by application of the element of chance, may deliver, or entitle the person playing or operating the machine to receive, cash, premiums, merchandise, or tokens, or

\*     \*     \*     \*     \*     \*

"(b) *Exclusion.*—The term 'coin-operated amusement or gaming de-vice' does not include bona fide vending machines in which are not incorporated gaming or amusement features."

The pretrial order subscribed to by the parties described the "Skill Parade" machine as follows:

"A 'Skill Parade' machine is activated by the insertion of a coin which drops to the first of three slanted parallel tracks. The coin is propelled along each parallel track by a spring lever device on the left side of the machine. There are individual traps along each track and each trap is marked with the picture of an animal. The corresponding traps on each track are marked with the same animal picture. The player attempts to propel the coin into traps with identical pictures on each of the three successive tracks. When the coin is propelled along the track and drops into a trap, it lights up a picture of the animal represented by that trap on a scoring board. The coin then drops into the propelling mechanism on the next lower track and the performance is repeated.

"The machine awards a set number of free games for the animal combinations posted thereon. The player may insert up to seven coins in the machine and increase the free games that may be won by the same factor as the number of coins inserted. For instance, if a certain combination awards two free games on the insertion of one coin, it will award four on the insertion of two coins, six on the insertion of three coins up to fourteen upon the insertion of seven coins.

"The machine contains a meter to register the free games. However, the machine is not equipped with a push button or 'knock-off' button for releasing free games, nor is it equipped with a meter for registering the free games released or 'knocked-off' rather than played off. The free games could be released by discon-

necting the electric circuit at the wall plug.

"In some instances the operators of the machine would redeem the free games at the rate of one game for one coin required to operate the game. The maximum number of free games that can be registered on the 'free game' meter is 999."

and the "Jokers Wild" machine as follows:

"The 'Jokers Wild' is a coin activated device which has an enclosed platform containing thirty-three semi-spheres which act as pockets to receive five rubber balls also contained in the platform enclosure. In the center of each spherical pocket is a plunger which serves a dual purpose, one, upon the proper signal from the player it propels any rubber ball resting on it into the air and, secondly, it registers occupancy of the space when a ball is resting on it.

"The player inserts a coin which causes all of the five rubber balls to be propelled into the air. After activation they come to rest in the semi-spheres which are marked from ace down to seven of the four playing card suits, viz, spades, hearts, diamonds, and clubs, with the center spot marked as joker.

"The purpose of the play is to perfect as high a poker hand as possible. There are 'holding' buttons on the machine available to the player so that if any of the balls have come to rest in favorable semi-spheres on the first activation, the operator presses the buttons to hold the balls in place during the second activation which is accomplished by pressing a button on the machine. By pressing the 'draw' button all of the balls not marked 'hold' by the player are again propelled into the air and subsequently come to rest in one of the semi-spheres. The game similates draw poker and free games are registered on a meter.

The maximum number of free games that can be registered on the 'free game' meter is 999.

"The machine is not equipped with a push button or 'knock-off' button for releasing free games, nor is it equipped with a meter for registering the free games released or 'knocked-off' rather than played off. The free games could be released by disconnecting the electric circuit at the wall plug. There is no way to increase the number of free games awarded on certain combinations similar to poker hands. The machine will only take one coin at a time."

and the "Rainbow Stamp" machine as follows:

"The 'Rainbow Stamp' machine is a metal box measuring approximately 18 inches high, 8 inches wide, and 6 inches deep. The machine is equipped with two coin insert slots and two coin return chutes. Each machine also has two levers which, when either is pressed downward, dispenses a cardboard folder enclosing a rainbow stamp from one of two slots in the front of the machine. The stamps, in individual cardboard folders, are stacked inside the device in two metal chutes by the operator of the establishment according to instructions attached to the back inside wall of the device.

"The machine can be operated in one of two ways. The machine can be adjusted so that a coin must be inserted before the lever can be depressed and a ticket dispensed; or an adjustment can be made so that the lever can be depressed at will, without the insertion of a coin to trigger the release mechanism, to permit the depression of the lever which dispenses a cardboard folder containing a stamp.

"The stamps dispensed by the machines have printed on their face the letters 'RAINBOW STAMPS.' The stamps are purchased in loads

of 1000 stamps for $20.00 per 'load' from the owners of the machines.

"Most of the stamps contained in a 'load' had the letters 'S T A M P S' printed in blue ink. A few of the stamps have either one, two, or three of the letters printed in red ink. (Each of the loads sold during the taxable periods in question contained approximately the same number of stamps with all blue letters and the same number of stamps with some red letters.) Exhibit 2, marked for identification only, contains samples of each of the various types of stamps dispensed by the 'Rainbow Stamp' machine.

"The majority of the machines in use in the Portland area were in taverns and were used to dispense tickets which in most instances were used as a basis for awarding cash or merchandise prizes for certain specified winning tickets. In some instances when the machines were so used, the patron would deposit 25 cents in the machine and depress the lever. The machine would always dispense the next ticket in the 'load'. In other instances the machine would not be within reach of the public and the patron would pay 25 cents to the attendant who in turn would depress the lever and hand the ticket to the patron. If all of the letters on the stamp were blue the player received nothing from the operator of the machine but had the right to save the losing ticket and redeem it for merchandise as described in Article XXX. If the patron received a stamp containing one or more of the letters printed thereon in red ink, he received a cash or merchandise award from the operator of the machine according to the following scale:

"One Red Letter        $1.00
"Two Red Letters         5.00
"Three Red Letters      10.00

"With respect to the machines described in this article the total amount received from the sale of all 1,000 stamps in a 'load' was $250.00. Patrons holding winning tickets in a 'load' usually received a total of $180.00. The operator's profit on a 'load' was approximately $50.00 after paying the $20.00 charge for the stamps to the owner of the machine."

I am satisfied that under the tests laid down in United States v. Korpan, 354 U.S. 271, 77 S.Ct. 1099, 1 L.Ed. 2d 1337; United States v. Nine Gambling Devices, 52–2 T.C. ¶257 (S.D.Ill. 1957); and Turner v. United States, 62–1 T.C. ¶15,402 (Kansas, April 4, 1962), that the "Skill Parade" machine and the "Jokers Wild" machine are each a gaming device per se under § 4462(a)(2).

To coin a phrase, each of these machines is "an electronic cashier" which, in return for the activating coin and the player's manipulation of a trigger, reaches a multiple award based upon chance through the workings of its own inherent mechanical design, make and being an electronic operation. The award is made known through a self-illuminating sign indicating a certain number of free games rather than a dropping of a like number of nickels. With little or no effort, this electronic cashier could ascertain and withhold the government tax. This court is of the opinion that the Director's assessment of a special tax upon these machines is valid.

As to the "Rainbow Stamp" machine, I am of the opinion that it is shielded from the special tax through the wording of the "exclusion." It is apparent from the agreed delineation of this machine and its use that it is good or evil, if that be a correct designation, using evil as synonymous with a taxable gaming device, lies not with its own inherent mechanical design, make and being, but rather with the use to which it is put. It can, for a coin, at the choosing of its operator, dispense to the depositor postage stamps, razor blades or other items of merchandise or put to view a royal flush, craps, or beady snake eyes.

84

It follows that whether the depositor receives a razor blade, the thrill of craps, or the disappointment of snake eyes depends not upon features incorporated in and inherent to the machine, but rather upon the design and composition of separate items or subparts foreign to the design and being of the machine. It is the foreign subparts that delineate or determine the award rather than an intended purchased item, a chanced fortune, or nothing. The exclusionary clause excludes "bona fide vending machines in which are not incorporated gaming or amusement features." It necessarily follows that a machine that incorporates gaming or amusement features is not "bona fide" and the corollary a "bona fide" vending machine is one in which are not incorporated gaming or amusement features. Webster's New International Dictionary, Second Edition, teaches us that the adjective "incorporated" means "united in one body." The verb "incorporate" means "to form into a body; to combine, as different ingredients, into one consistent mass."

The Director cites United States v. Brown, 156 F.Supp. 121 (W.D.Iowa 1957) as authority to support his assessment of the special tax upon the "Rainbow Stamp" machine. Brown dealt with an entirely different Act of Congress, namely, Title 15 U.S.C.A. § 1171(2), which provides that "the term 'gambling device' means (2) any machine or mechanical device designed and manufactured to operate by means of insertion of a coin, token, or similar object and designed and manufactured so that when operated it may deliver, as the result of the application of an element of chance, any money or property; or

"(3) any subassembly or essential part intended to be used in connection with any such machine or mechanical device."

It is apparent from a reading that this criminal statute is much broader than the Revenue statute involved in the instant proceedings. This court is of the opinion that the Director's assessment upon the "Rainbow Stamp" machine is invalid.

Counsel for the prevailing parties under this opinion are requested to draw and submit proposed findings of fact, conclusions of law and judgment in conformity with their respective contentions. In the event counsel cannot submit proposed findings, conclusions and judgment order agreeable as to form, separate proposals may be submitted for settlement upon further order.